UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
———————————————————————

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.

BLAKE RIVERA and VICTOR RIVERA,

                  Defendants.

———————————————————————

<u>REPORT & RECOMMENDATION</u>

16-CR-6024W

## <u>PRELIMINARY STATEMENT</u>

By Order of Hon. Charles J. Siragusa, United States District Judge, dated March 4, 2016, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 12). Subsequent to that Order, the case was reassigned to United States District Judge Elizabeth A. Wolford. (Docket # 15).

On March 3, 2016, the grand jury returned a two-count indictment against defendants Blake Rivera, Victor Rivera and Chayanne Rivera. (Docket # 11). Count One charges the defendants with conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine and one hundred grams or more of heroin, in violation of 21 U.S.C. § 846. (*Id.*). Count Two charges them with possessing firearms in furtherance of the charged drug conspiracy, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. (*Id.*).

Currently pending before the Court are several pretrial motions filed by Blake Rivera ("Blake") and Victor Rivera ("Victor").[1] Blake moves to suppress tangible evidence

---

[1] Both defendants filed omnibus motions seeking other relief (Docket ## 62, 77), which were decided by the undersigned or resolved by the parties. (Docket ## 73, 85).

seized pursuant to a warrant authorizing the search of a storage unit, to suppress identification testimony, and to dismiss the indictment on the grounds of insufficiency.  (Docket ## 84, 85). Victor also moves to suppress identification testimony and to dismiss the indictment on the grounds of insufficiency.  (Docket ## 72, 73).

Separate evidentiary hearings were conducted on their motions to suppress identification testimony.  (Docket ## 79, 84).  Counsel made their post-hearing arguments orally on the record following the hearing on Blake's motion.  (Docket # 84).  Counsel submitted post-hearing memoranda in writing following the hearing on Victor's motion.[2]  (Docket ## 107, 117).

## DISCUSSION

### I.   Suppression of Identification Testimony

Each defendant moves to suppress identification testimony of a confidential source ("CS") who identified photographs of each of them in arrays shown *seriatim* to the CS on July 22, 2015.  (Docket ## 62, 77).  This Court held separate evidentiary hearings on each motion at which the government offered testimony from Sabatino Smith ("Smith"), a special agent with the Drug Enforcement Administration.  (Docket ## 79, 84).  Neither defendant called any witnesses.  (*Id.*).

### A.   January 19, 2017 Hearing on Victor's Motion

The evidentiary hearing relating to Victor Rivera's motion was conducted on January 19, 2017.[3]  At the hearing, Smith testified that he had been employed as a DEA agent

---

[2]  The government was afforded the opportunity to respond to Victor's post-hearing submission by October 20, 2017 (Docket # 115), but did not do so and elected to stand on its June 30, 2017 submission.

[3]  The transcript of the January 19, 2017 hearing shall be referred to as "Tr. ___."  (Docket # 86).

since September 2009.  (Tr. 4).  In July 2015, he was working on an investigation of drug dealing by Blake Rivera, his father Victor Rivera, and his brother Chayanne Rivera.  (Tr. 5).  On July 22, 2015, Smith and Investigator Tim Pearce ("Pearce") of the Rochester Police Department met with the CS to prepare for a controlled purchase by the CS from Blake.  (Tr. 5-6, 27-28).  Before the purchase, the agents showed the CS two arrays – one containing a photograph of Victor and the other containing a photograph of Blake.  (Tr. 6-7).

       Smith testified that he did not tell the CS in advance that he intended to show him photographic arrays.  (Tr. 25).  Rather, the CS met with Smith and Pearce in Pearce's car to plan the controlled purchase.  (Tr. 6, 27-28).  They met together (the agents in the front seat and the CS in the back) for approximately fourteen minutes and discussed the planned purchase; Smith acknowledged that they may have discussed Victor because he lived at the residence where the controlled purchase was expected to occur.  (Tr. 28-29).  After discussing the controlled purchase, Smith handed an array to the CS.  (Tr. 8, 13-14, 27-28).  He told the CS that "it wasn't necessary to identify anybody, but if the source identified anybody, to let [him] know."
(Tr. 7-8).  Smith testified that the first array that he handed to the CS was the one with Blake's photograph, and the CS correctly identified the photograph of Blake Rivera as the man Smith knew as "Blake."  (Tr. 7-8, 10-11, 25-26).  After that procedure, Smith testified, he repeated the same instructions and handed the CS the array containing the photograph of Victor.  (Tr. 7-8; G. Ex. 1).  Smith testified that neither he nor Investigator Pearce suggested which photograph the CS should identify.  (Tr. 8).

       After Smith handed the CS the array containing Victor's photograph, the CS stated that he identified one of the photographs.  (Tr. 9).  Smith asked which one, and the CS responded that he identified photograph number three; Smith asked who it was, and the CS

replied, "Vic[k]."  (Tr. 9).  Smith directed the CS to circle the photograph of Vick and to place

the CS's initials, the date, and the name of the person depicted next to the photograph.  (Tr. 9).

The CS circled the third photograph, and wrote the name of "Vick," his own initials, and the date

next to it.  (Tr. 9-10; G. Ex. 1).  Smith and Pearce thereafter signed the array and filled in the

date and time.  (Tr. 10; G. Ex. 1).  The time noted on the array is "2044."  (G. Ex. 1).

Smith testified that he had not shown the CS any photographs of Victor Rivera

before the identification procedure on July 22, 2015.  (Tr. 10).  He also made clear that he had

not spoken with the CS about identifying physical characteristics of Victor before showing him

the array.  (Tr. 20-21, 22-23).  According to Smith, during a previous telephone conversation

with the CS, the CS had indicated that Victor was Blake's father.  (Tr. 22).

### B.    February 24, 2017 Hearing on Blake's Motion

Smith also testified as the government's witness at the evidentiary hearing

relating to Blake's suppression motion.  (Docket # 84).[4]  He testified about the same July 22,

2015 meeting with the CS.

Smith reiterated that he showed two arrays to the CS before the CS's controlled

purchase from Blake.  As he had during Victor's hearing, Smith testified that he showed the

arrays to the CS, one after the other, accompanied by the instruction that it was not necessary for

the CS to recognize anyone but that if he did he should advise Smith.  Smith again testified that

he had not told the CS in advance that he planned to show him arrays and that the agents did not

suggest any particular photograph that the CS should be expected to identify.  Smith also

testified that the CS had not provided a physical description of Blake before viewing the arrays,

although he acknowledged that the CS had previously discussed Blake and his father with Smith.

---

[4]  Although the hearing was recorded, no transcript has been prepared.  The Court has reviewed the audio recording in connection with the preparation of this report and recommendation.

Contrary to Smith's testimony at Victor's hearing, Smith testified that he showed the array containing Victor's photograph to the CS *before* he showed the array with Blake's photograph. Indeed, the time noted by hand on the two arrays indicates that the CS's identification of Victor occurred at 20:44, while the identification of Blake occurred at 20:46. (*Compare* G. Ex. 1 *with* G. Ex. 3).

With respect to the CS's identification of Blake's photograph, Smith testified that after the CS identified Victor in the first array shown, he handed the CS the second array and repeated his instructions. The CS stated that he recognized "Blake" in photograph number four. The CS circled the fourth photograph, and placed the CS's initials, the date, and the name "Blake" next to the photograph. (G. Ex. 3). Smith testified that he retrieved the photograph from the CS, and he and Pearce signed it.

## C. <u>Discussion</u>

### 1. <u>Applicable Caselaw</u>

Evidence of an out-of-court photographic identification will be suppressed under the due process clause if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). In determining whether to exclude evidence of a pretrial identification, a court must first consider whether the identification procedure was unduly suggestive. *Id.* To decide whether a photographic array is unduly suggestive, a court should consider several factors, including "the size of the array, the manner of presentation by the officers, and the array's contents." *United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990), *cert. denied*, 501 U.S. 1233 (1991). Specifically, the court must consider "whether the picture of the accused . . . so stood out from all the other photographs as to

suggest to an identifying witness that [the accused] was more likely to be the culprit." *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986) (internal citations omitted).

If the identification procedure was unduly suggestive, the court must proceed to determine whether the identification nevertheless possesses "sufficient aspects of reliability." *United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.) (citing *Manson v. Brathwaite*, 432 U.S. 98, 109-17 (1977)), *cert. denied*, 434 U.S. 872 (1977). "Even if the procedure was unnecessarily (or impermissibly) suggestive . . .[,] a district court may still admit the evidence 'if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.'" *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir.) (footnote omitted) (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir.), *cert. denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862 (1994).

## 2.    The Procedures Were Not Suggestive

Victor challenges the procedure on the grounds that Smith's testimony "revealed that . . . Smith allegedly told the [CS] that he was going to look at photographs that may contain a [f]ather and [s]on" and that his selection of Blake's photograph from the first array improperly suggested that the next array would contain Victor's photograph. (Docket # 117 at 2). This challenge is based upon a mistaken factual premise – that Smith told the CS that he would be looking at photographs of a father and son. Rather, Smith testified credibly that he did not tell the CS in advance that the CS would be asked to look at photographic arrays; moreover, he testified that the CS had described the father-son relationship between Victor and Blake in an earlier telephonic discussion with him. Smith's later testimony and the arrays themselves appear to demonstrate that his testimony at Victor's hearing about the order of the procedures was incorrect and that the array with Victor's photograph was shown first to the CS. In any event,

regardless of which was displayed first, nothing about the manner of the procedure, the instructions given, or the array itself was suggestive. *See United States v. Williams*, 2015 WL 429087, *17 (W.D.N.Y.) (manner of presentation of array not unduly suggestive where it did not suggest to the witness which, if any, photograph to select); *report and recommendation adopted*, 2015 WL 3454430 (W.D.N.Y. 2015); *United States v. Guzman*, 2015 WL 774211, *7 (W.D.N.Y. 2015) (same).

At the conclusion of Blake's hearing, his attorney made clear that his challenge was based on the attributes of the array itself:  namely, that Blake's photograph is taken from a closer perspective that makes his face appear larger than the faces of the other men depicted. Although he is correct that the photograph is more of a "close-up" photograph than the others, Blake's features are sufficiently similar to the features of the others – in complexion, hair length and color, facial hair, facial features, and overall age – so as not to draw undue attention to Blake's photograph. *See*, *e.g.*, *United States v. Bautista*, 23 F.3d 726, 731 (2d Cir.) (finding photograph of defendant, which "was brighter and somewhat more close-up than the other five photographs in the array," did not render array suggestive), *cert. denied*, 513 U.S. 862 (1994); *United States v. Christner*, 2015 WL 6508058, *17 (W.D.N.Y. 2015) (array not suggestive where "individuals depicted have similar physical characteristics"), *report and recommendation adopted*, 2016 WL 324546 (W.D.N.Y. 2016); *United States v. De La Rosa*, 2008 WL 2595173, *6 (W.D.N.Y.) (array not suggestive where it contained "photographs of other men with similar physical characteristics (age, complexion, facial hair, hair style and hair length)"), *report and recommendation adopted*, 2008 WL 2595171 (W.D.N.Y. 2008).  *See also Jarrett v. Headley*, 802 F.2d at 41 (court must consider "whether the picture of the accused . . .  so stood out from all

the other photographs as to suggest to an identifying witness that [the accused] was more likely

to be the culprit") (internal citations omitted).

   For these reasons, I recommend that the district court deny the motions by Victor

and Blake to suppress identification testimony from the CS.


## II.  <u>Suppression of Evidence Seized from Uncle Bob's Self Storage</u>

   On February 15, 2016, Monroe County Court Judge Victoria M. Argento issued a

warrant authorizing the search of Unit # 503 at Uncle Bob's Self Storage, 2585 Brighton

Henrietta Town Line Road, Rochester, New York.  (Docket # 80-1).  The warrant, which was

issued upon an affidavit sworn by Pearce, authorized the search of the entire unit for evidence of

a "drug related offense," including records relating to the sale and trafficking of cocaine and

heroin and profits derived therefrom.  (*Id.*).

   Pearce's affidavit summarized information he learned during the investigation by

the Greater Rochester Area Narcotics Enforcement Team ("GRANET") into alleged drug

activities involving defendants Blake, Victor, and Chayanne Rivera.  (*Id.* at 2-21).

### A. <u>Pearce's Affidavit</u>

#### 1.  <u>CS-1</u>

   Pearce's affidavit recounted information provided by two confidential sources,

both of whom were described as individuals who had previously provided Pearce with reliable

information about drug dealing.  (*Id.* at 6-7, 9).  According to Pearce, the first source, CS-1,

began relaying information to GRANET about this investigation in May 2014.  (*Id.* at 6).  At that

time, CS-1 told Pearce that a Hispanic male was selling cocaine from the downstairs apartment at

155 McArdle Street.  (*Id.* at 7).  CS-1 told Pearce that on multiple occasions, CS-1 waited

outside the apartment while another individual (described in the affidavit as "an unwitting

individual") went inside and returned with cocaine. (*Id.*). CS-1 reported that the other individual

had "observed several kilos of cocaine on the table on a couple of occasions." (*Id.*). According

to Pearce's affidavit, records from Rochester Gas and Electric showed that Victor Rivera was the

subscriber for utility service at that apartment between November 15, 2013 and December 8,

2014. (*Id.*).

In May 2015, CS-1 told Pearce that the "unwitting individual" had identified the

Hispanic male as "Victor" and indicated that he had moved to 164 Curtis Street; CS-1 also told

Pearce that he had seen Victor in front of 164 Curtis Street at the end of May. (*Id.*). Pearce

stated that Monroe County Clerk records indicated that Blake Rivera owned multiple residences,

including 164 Curtis Street, 230 Electric Avenue, and 276 Woodsmoke Lane. (*Id.*). Further,

Blake had listed Victor Rivera as his father on a Monroe County Prisoner Data Report. (*Id.*).

Rochester Gas and Electric records showed that Grissel Rivera, Blake Rivera's wife, had been

the subscriber for utility service at 164 Curtis Street since October 21, 2009. (*Id.*). On June 2,

2015, CS-1 positively identified Victor Rivera as the "Victor" he had seen at 164 Curtis Street.

(*Id.*).

On June 8, 2015, Pearce observed a 2015 Ford Escape pull into the driveway at

164 Curtis Street. (*Id.*). Rental records show that this vehicle had been rented by Blake Rivera

of 164 Curtis Street on May 24, 2015. (*Id.* at 8). Pearce also observed "several vehicles arrive at

164 Curtis Street and stay for a short time." (*Id.* at 7-8). Later that day, CS-1 told Pearce that he

had received a call that a cocaine shipment had arrived, and arrangements were made for CS-1 to

make a controlled purchase of cocaine. (*Id.*). According to Pearce, he and Smith met with CS-1,

searched him and provided him with currency. (*Id.*). They observed him pick up an "unwitting

individual," described as a black male, who got into CS-1's vehicle, and the officers observed the car drive to 164 Curtis Street. (*Id.*). The officers saw the black male get out of the vehicle at 164 Curtis Street and enter the building. (*Id.*). They observed the male exit 164 Curtis, re-enter CS-1's car, and drive away from the area. (*Id.*). CS-1 later met the officers at a predetermined location and handed Pearce a quantity of cocaine. (*Id.*). Following the same plan, CS-1 and the "unwitting individual" engaged in a second controlled purchase of cocaine from 164 Curtis Street during the week of June 21, 2015. (*Id.* at 8-9). While conducting surveillance of the second controlled purchase, Smith observed a 2014 Chrysler parked in the driveway of 164 Curtis Street, which records show had been rented by Blake Rivera on June 16, 2015. (*Id.* at 9).

### 2.    CS-2

In July 2015, a second confidential source, CS-2, told Smith and Pearce that he had met that month with father "Vic" and son "Blake" in a white Chrysler C30, and Blake had shown him a large amount of cocaine, stated that "they were running the city," and provided CS-2 his phone number to use if CS-2 wanted cocaine or heroin. (*Id.*). CS-2 identified photographs of Victor Rivera and Blake Rivera as the individuals with whom he had met in the Chrysler C30. (*Id.*).

Also in July 2015, Pearce observed a Dodge Challenger parked in the driveway of 276 Woodsmoke Lane, where Blake Rivera was known to live. (*Id.* at 9, 10). The vehicle had been rented by Blake. (*Id.* at 10). The next day, following a plan formulated by Pearce and Smith, CS-2 called Blake, who told CS-2 to meet him on Emerson Street. (*Id.*). Smith and Pearce subsequently observed the same Dodge Challenger pull up to CS-2's vehicle on Emerson Street, and the driver of the Dodge, later identified as Victor, motioned for CS-2 to follow. (*Id.*). CS-2 followed Rivera to 164 Curtis Street, where CS-2 met with Blake Rivera on the front porch

and agreed to purchase sixty-two grams of cocaine for $2,600 at a later time. (*Id.*). During the week of July 19, 2015, CS-2 returned to 164 Curtis Street to make the purchase. (*Id.*). Pearce and Smith observed the Dodge Challenger in the driveway of 164 Curtis Street during the purchase. (*Id.*). Following the purchase, CS-2 drove to a predetermined location and provided Pearce and Smith with a quantity of cocaine. (*Id.*).

According to Pearce, during the week of August 30, 2015, CS-2 made another controlled purchase of cocaine from Blake at 164 Curtis Street. (*Id.* at 11). Following the purchase, CS-2 met with DEA Agents Christopher Mahaffy and William MacMillian and reported that during his meeting with Blake at 164 Curtis Street, Blake had taken a key from a bag and gone upstairs to retrieve the cocaine. (*Id.*). CS-2 also reported that Blake stated that he sells more heroin than cocaine. (*Id.*).

Pearce described a third controlled purchase made by CS-2 at 164 Curtis Street during the week of October 4, 2015. (*Id.* at 12-13). On this occasion, CS-2 called Blake Rivera, who told CS-2 to meet Rivera's brother at 164 Curtis Street. (*Id.* at 12). Following the transaction, CS-2 met with Pearce and Smith and handed them a quantity of cocaine which he reported had been provided to him by co-defendant Chayanne Rivera; he also reported that he had observed a pistol grip shotgun in the kitchen during the drug transaction. (*Id.* at 12-13).

Pearce described a fourth controlled purchase made by CS-2 at 164 Curtis Street during the week of November 15, 2015. (*Id.* at 14). On this occasion, CS-2 called Chayanne Rivera, but the phone was unable to accept calls at that time. (*Id.*). CS-2 was instructed by the investigative team to travel to 164 Curtis Street, where he spoke with Victor. Victor successfully telephoned Chayanne and told him that CS-2 was trying to meet with him. Chayanne stated that he would meet with CS-2 at 164 Curtis Street forty-five minutes later. (*Id.*). CS-2 departed from

164 Curtis Street, and remained under surveillance until CS-2 received a phone call from Chayanne stating that he was now at 164 Curtis Street and ready to conduct the transaction. (*Id.* at 14-15). Agent James Schmitz observed CS-2 approach 164 Curtis and later leave the vicinity. (*Id.* at 15). Following the purchase, CS-2 met with Smith and Pearce and provided them with a quantity of cocaine purchased from Chayanne. (*Id.*). CS-2 told the investigators that Chayanne opened the door, let him into the residence, and went upstairs to retrieve the drugs. (*Id.*).

According to Pearce, CS-2 made another controlled purchase from Chayanne Rivera at 164 Curtis Street during the week of December 20, 2015. (*Id.* at 16-17). On this occasion, Chayanne also went upstairs before returning with the requested amount of cocaine. (*Id.* at 17).

Pearce's affidavit described another controlled purchase of cocaine from Blake Rivera at 164 Curtis Street during the week of January 10, 2016. (*Id.* at 17-18). Following the transaction, CS-2 met with Pearce and Smith and provided them with a quantity of cocaine. (*Id.* at 17). CS-2 told them that when he entered 164 Curtis Street, he saw Blake and three Hispanic males processing heroin in the kitchen. Blake went upstairs to retrieve the cocaine for CS-2. (*Id.* at 17-18). CS-2 also stated that there were several security cameras positioned outside the residence. (*Id.* at 17).

Pearce described a final controlled purchase by CS-2 from Blake Rivera at 164 Curtis Street during the week of February 7, 2016. (*Id.* at 18-19). After this purchase, CS-2 met Pearce and Smith at a predetermined location and handed them a quantity of cocaine. (*Id.* at 19). CS-2 reported that when he entered 164 Curtis Street, he observed Victor and Blake "cooking cocaine into crack" in the kitchen. (*Id.*). CS-2 stated that Blake went upstairs and returned with a plastic bag containing cocaine that he handed to CS-2. (*Id.*).

### 3. <u>GPS Tracking Device</u>

On July 29, 2015, United States Magistrate Judge Jonathan W. Feldman authorized the installation and use of a GPS tracking device for the 2015 Dodge Challenger rented by Blake Rivera. (*Id.* at 10). According to Pearce, GPS monitoring showed that the Dodge Challenger "routinely traveled" from Blake's residence at 276 Woodsmoke Lane to 164 Curtis Street; the tracking device also revealed that the Dodge traveled to the Emerson Street area where Victor Rivera had met CS-2 and then to 164 Curtis Street. (*Id.* at 11). As described by Pearce, the vehicle took "circuitous routes on residential side streets when traveling to and from 164 Curtis Street, which [Pearce knew to be a] counter-surveillance tactic commonly used by drug traffickers to try and detect the presence of law enforcement officers." (*Id.*).

On or about August 25, 2015, agents observed the 2015 Dodge Challenger parked in front of Enterprise Car Rental at the Greater Rochester International Airport. (*Id.*). Another agent observed Blake Rivera pull out of the airport parking lot in a 2015 GMC Yukon. (*Id.*). On August 26, 2015, this Court authorized the installation and use of a GPS tracking device on the 2015 GMC Yukon. (*Id.*).

On September 27, 2015, agents observed the GMC Yukon parked in front of Enterprise Car Rental at the Greater Rochester International Airport. (*Id.* at 12). Pearce observed a 2015 GMC Acadia parked in Blake Rivera's driveway; a few days later this Court issued a warrant authorizing the use of a GPS tracking device on the Acadia. (*Id.*). The authorization was further extended for an additional forty-five days on November 13, 2015. (*Id.* at 14).

### 4.     <u>Uncle Bob's Self Storage</u>

On October 7, 2015, at approximately 6:31 p.m., the GPS tracking device on the 2015 GMC Acadia showed that the vehicle had traveled to Uncle Bob's Self Storage, 2585 Brighton Henrietta Town Line Road, Rochester, New York 14623 ("Uncle Bob's" or "the storage unit"). (*Id.* at 13). Video footage from Uncle Bob's showed that the 2015 GMC Acadia entered the security gate and pulled up to storage unit # 503. (*Id.*). According to Pearce, the footage showed an unidentified adult male exit the vehicle and enter the storage unit. (*Id.*). The individual spent approximately three minutes and fifteen seconds in the unit before exiting the unit, opening the passenger's side door briefly, and then entering the driver's side of the vehicle and driving away. (*Id.*). According to Pearce, the vehicle spent less than five minutes in total at the storage unit. (*Id.*).

Further investigation determined that storage unit # 503 had been rented by Grissel Rivera, Blake Rivera's wife, since November 27, 2012. (*Id.*). A review of the GPS tracking device, entry logs at Uncle Bob's, and the security camera at Uncle Bob's showed that the 2015 GMC Acadia returned to the unit seven more times between October 12 and November 7, 2015, each time in the evening or at night and for a short duration. (*Id.*). Between November 7, 2015 and February 15, 2016 (the date Pearce signed his supporting affidavit), seven more trips to Uncle Bob's occurred. (*Id.*).

According to Pearce, one of those occasions was during the week of December 20, 2015, following one of CS-2's cocaine purchases from Chayanne at 164 Curtis Street. (*Id.* at 23). Specifically, GPS tracking revealed that Blake's vehicle[5] traveled from 164 Curtis Street to

---

[5] This vehicle was a GMC Terrain rented by Blake, for which the Court authorized GPS tracking beginning December 17, 2015. (*Id.* at 16, 17).

Uncle Bob's approximately one hour after the sale. (*Id.* at 17). According to Pearce, video footage showed that a male matching the description of Blake Rivera removed a plastic grocery bag from his vehicle and placed it inside storage unit # 503 before departing. (*Id.* at 17). On February 10, 2016, video footage showed a male matching Blake's description entering Uncle Bob's storage unit # 503 and exiting moments later. (*Id.* at 19). This visit to Uncle Bob's took place the same week that CS-2 conducted a controlled purchase of cocaine at 164 Curtis Street from Blake and observed Blake and Victor in the kitchen cooking cocaine into crack. (*Id.*).

Finally, Pearce opined in his affidavit:

> Based on my training and experience, the use of a storage unit is behavior commonly associated with drug dealers distributing large amounts of narcotics as drug dealers often keep narcotics and/or currency in storage units in order to keep the items safe from other drug dealers and to avoid detection from law enforcement. Additionally, Blake Rivera has not been observed transporting large household items or storage boxes to the storage unit.

(*Id.* at 13-14).

### 5.    Intercepted FedEx Package

In his affidavit, Pearce also recounted that New York State Police Investigator Scott Shepherd contacted Pearce and Smith on December 4, 2015, to report that he had seized a FedEx package addressed to Ashton Johnson at 164 Curtis Street, Rochester New York. (*Id.* at 15-16). Pursuant to a search warrant, the package was searched and found to contain approximately 612.8 grams of heroin. (*Id.* at 16).

### B.    Validity of Search Warrant for Uncle Bob's Self Storage

Blake Rivera challenges the February 15, 2016 search warrant for Uncle Bob's Self Storage on the grounds that the application failed to establish probable cause and that the information contained in the warrant was stale. (Docket # 77 at 20-22).

1.      **Standing**

In its opposition brief, the government maintained that Blake Rivera had failed to establish standing to challenge the search of the storage unit.  (Docket # 80).  Blake subsequently filed a sworn affidavit asserting that he rented and utilized storage unit # 503 from November 27, 2012 through February 17, 2016.  (Docket # 81 at ¶ 4).  According to Blake's affidavit, the storage facility is secured by a fence and a password-protected locked gate.  (*Id.* at ¶ 6-7).  Further, entry to storage unit # 503 was through a single overhead entrance door, which was locked with a lock provided by Blake.  (*Id.* at ¶ 9).  Based on this submission, the government withdrew its standing objection on the record on February 24, 2017.  (Docket # 84).

This Court agrees that Blake's affidavit asserts a privacy interest sufficient to permit him to challenge the adequacy of the warrant.  *See United States v. Montoya-Escheverria*, 892 F. Supp. 104, 106 (S.D.N.Y. 1995) ("[t]he law is clear that the burden on the defendant to establish standing is met only by sworn evidence, in the form of affidavit or testimony, from the defendant or someone with personal knowledge"); *United States v. Eldridge*, 2012 WL 2131890, *3-5 (W.D.N.Y. 2012) (defendant possessed legitimate subjective expectation of privacy in residence of another used to store defendant's belongings sufficient to permit him to challenge search).

2.      **Probable Cause**

The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV; *see also* Fed. R. Crim. P. 41.  In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court affirmed the "totality of the circumstances" test to determine whether a search warrant satisfies the Fourth

Amendment's probable cause requirement. According to the court, the issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. at 238. Ordinarily, a reviewing court's obligation is merely to determine that the issuing judge had a "substantial basis for ... conclud[ing] that probable cause existed." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 238-39) (internal quotation omitted); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate"). Moreover, "resolution of doubtful or marginal cases should be largely determined by the preference to be afforded to warrants." *United States v. Smith*, 9 F.3d at 1012 (citing *Jones v. United States*, 362 U.S. 257, 270 (1960)).

Blake argues that Pearce's supporting affidavit fails to establish a sufficient nexus between the alleged criminal activity and the storage unit. (Docket # 77 at ¶ 40). Blake maintains that the investigative agents' inability either to identify him entering or exiting the storage facility or to observe drugs being transported to or from the storage unit, despite the availability of security footage and investigative surveillance, dooms any attempted showing of probable cause. (*Id.* at ¶ 41).

I disagree and find that Pearce's affidavit adequately established probable cause to search the storage unit. "[P]robable cause is a practical commonsense decision whether, given all the circumstances set forth in the affidavit . . . including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Fernandes*, 50 F. Supp. 3d 398,

17

405 (W.D.N.Y. 2014) (quoting *United States v. Howe*, 545 F. App'x 64, 66 (2d Cir. 2013) (additional citation omitted)). Pearce's affidavit described a nearly two-year investigation that revealed substantial evidence of Blake's involvement in a conspiracy with other family members to sell large quantities of cocaine and heroin, often from 164 Curtis Street. Indeed, 164 Curtis was the intended destination for the intercepted FedEx package containing 612.8 grams of heroin. During the investigation, agents learned that Blake used rental vehicles and frequently exchanged them for different vehicles, presumably in an effort to evade surveillance of his activities. GPS tracking revealed that those vehicles traveled from Blake's residence at 276 Woodsmoke Lane to 164 Curtis Street, around the neighborhood of 164 Curtis Street, and to Uncle Bob's. Visual and video surveillance confirmed that the vehicles were often present at 164 Curtis Street on multiple occasions when drugs were sold.

Indeed, an individual who matched Blake's description was seen on security footage entering a storage unit rented by Blake's wife and leaving minutes later. (*Id.* at 13, 17). Such visits occurred multiple times a month, always at night. In fact, on one such occasion, the vehicle traveled from 164 Curtis Street to the storage facility approximately one hour after CS-2 purchased cocaine from one of the co-defendants at 164 Curtis. As Pearce opined, drug dealers who distribute large amounts of narcotics often use a storage unit to safeguard currency and narcotics. *See*, *e.g.*, *United States v. Riley*, 906 F.2d 841, 845 (2d Cir. 1990) (finding probable cause to search storage locker where defendant had recently been seen using it, noting that "[drug] dealers use such lockers to store drugs pending distribution"); *United States v. Zhu Ming Wang*, 2004 WL 1469485, *4 (S.D.N.Y. 2004) (finding probable cause to search storage unit, noting that "[t]he affidavit is required to present information which establishes a probability, not a certainty, that incriminating evidence will be found").

3.    **Staleness**

Blake also argues that the information contained in Pearce's affidavit was too stale and unreliable to support a finding of probable cause that Uncle Bob's Self Storage would contain evidence of drug trafficking.  (Docket # 77 at 22).  According to Rivera, the surveillance of the vehicles at Uncle Bob's occurred in October and November 2015, more than three months prior to the execution of the search warrant.  (*Id.*).

"In determining whether probable cause exists, the magistrate is required to assess whether the information adduced in the application appears to be current, *i.e.*, true at the time of the application, or whether instead it has become stale."  *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991).  "The doctrine of staleness applies when information proffered in support of a warrant application is so old that it casts doubt on whether the fruits or evidence of a crime will still be found at a particular location."  *United States v. Lamb*, 945 F. Supp. 441, 459 (N.D.N.Y. 1996).  "While there is no bright line rule for staleness, the facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past."  *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993).  Accordingly, "[t]he information offered in support of the application for a search warrant is not stale if 'there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises.'"  *United States v. Lacy*, 119 F.3d 742, 745-46 (9th Cir. 1997) (quoting *United States v. Gann*, 732 F.2d 714, 722 (9th Cir.), *cert. denied*, 469 U.S. 1034 (1984)), *cert. denied*, 523 U.S. 1101 (1998).

"[T]he principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to have violated the

law." *United States v. Diaz*, 176 F.3d 52, 109 (2d Cir.) (internal citations and quotations omitted), *cert. denied*, 528 U.S. 875 (1999); *United States v. Lamb*, 945 F. Supp. at 460. "Some types of evidence are more likely to remain in one location than other types of evidence." *United States v. Patt*, 2008 WL 2915433, *12 (W.D.N.Y. 2008). In addition, "[w]here the criminal activity is suspected to be ongoing, 'the passage of time between the last described act and the presentation of the application becomes less significant.'" *United States v. Gayle*, 2009 WL 4667093, *3 (S.D.N.Y. 2009) (quoting *United States v. Gallo*, 863 F.2d 185, 192 (2d Cir. 1988), *cert. denied*, 489 U.S. 1083 (1989)). Accordingly, "[t]he age of the information is relevant only insofar as it affects the likelihood that evidence will be found at the premises." *See United States v. Zoernack*, 2005 WL 1837962, *2 (S.D.N.Y. 2005).

I conclude that the information contained in Pearce's affidavit regarding Uncle Bob's was not stale. "Narcotics conspiracies are the very paradigm of the continuing enterprises for which the courts have relaxed the temporal requirements of non-staleness." *United States v. Feola*, 651 F. Supp. 1068, 1090 (S.D.N.Y. 1987) (citation omitted), *aff'd*, 875 F.2d 857 (2d Cir. 1989). The investigation showed that the storage unit had been rented by Blake's wife since November 27, 2012. (Docket # 80-1 at 13). According to the affidavit, information obtained from GPS tracking, entry logs of Uncle Bob's, and security cameras showed that the unit was visited multiple times in September, October and November 2015. (*Id.*). The unit was visited seven more times between November 7, 2015 and February 15, 2016, when the warrant was issued, including one visit on February 10, 2016. (*Id.* at 13, 19). These allegations, read in conjunction with the allegations of Blake's involvement in substantial drug dealing over a significant period of time, easily refute any challenge that the information was too stale to establish probable cause. *See Rivera v. United States*, 928 F.2d at 602 ("[i]n investigations of

ongoing narcotics operations, we have held that intervals of weeks or months between the last described act and the application for a warrant did not necessarily make the information stale"); *United States v. Bailey*, 2016 WL 6995067, *21 (W.D.N.Y. 2016) (evidence that vehicle was used to transport money and narcotics five days before warrant issued was not stale), *report and recommendation adopted*, 2017 WL 663578 (W.D.N.Y. 2017); *United States v. Mullen*, 451 F. Supp. 2d 509, 544 (W.D.N.Y. 2006) ("search warrants issued for 'books and records' of a criminal enterprise 'remain fresh for probable cause purposes for years'") (quoting *United States v. Feola*, 651 F. Supp. at 1090-91); *United States v. LaMorte*, 744 F. Supp. 573, 576 (S.D.N.Y. 1990) ("[u]nlike drugs or cash, records of past activity are likely to be maintained over time").

### 4. <u>Good Faith Reliance</u>

In any event, nothing in the record suggests that the searching officers did not rely upon the search warrant in good faith. In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court held that the Fourth Amendment exclusionary rule should not be applied to evidence obtained by a police officer whose reliance on a search warrant issued by a neutral magistrate was based on "objective good faith," even though the warrant itself might ultimately be found to be defective. *Id.* at 918-23; *United States v. Salameh*, 152 F.3d 88, 114 (2d Cir. 1998), *cert. denied*, 525 U.S. 1112 (1999); *United States v. Benedict*, 104 F. Supp. 2d 175, 182 (W.D.N.Y. 2000). The rationale underlying this good-faith exception is that the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *United States v. Leon*, 468 U.S. at 919. The warrant here was not so facially deficient or so lacking in probable cause that reliance upon it would have been objectively unreasonable. *See Leon*, 468 U.S. at 923; *United States v. Cancelmo*, 64 F.3d 804, 807 (2d Cir. 1995) (citations omitted).

For all of the reasons explained above, it is my recommendation that Blake's motion to suppress evidence seized from Uncle Bob's Self Storage be denied.

### III.    Dismissal of the Indictment

Both defendants move for an order dismissing the indictment on the grounds of insufficiency. (Docket ## 62 at 16-17; 77 at 18-19). In identical two-paragraph arguments, defendants contend that the government may have elicited grand jury testimony from a confidential informant "who was operating under the threat of a criminal prosecution." (*Id.*). Defendants speculate that the witness' interest in avoiding prosecution by cooperating with the government may not have been disclosed to the grand jury. (*Id.*). Defendants request that the Court inspect the minutes and "conduct its own investigation as to the sufficiency of the evidence before the [g]rand [j]ury as well as the propriety of the [g]overnment's conduct with that body." (*Id.*).

There is a presumption that grand jury proceedings are lawful and regular, *United States v. Torres*, 901 F.2d 205, 232 (2d Cir.) (quoting *Hamling v. United States*, 418 U.S. 87, 139 n.23 (1974)), *cert. denied*, 498 U.S. 906 (1990), and disclosure of grand jury proceedings is available only by order of the Court. Fed. R. Civ. P. 6(e). A party seeking disclosure bears the burden of establishing a "particularized need" or "compelling necessity" for such disclosure that outweighs the policy of grand jury secrecy. *Douglas Oil Co. of Cal. v. Petrol Stops Northwest*, 441 U.S. 211 (1979); *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959); *In re Rosahn*, 671 F.2d 690, 695 (2d Cir. 1982). Unspecified allegations of impropriety or mere speculation are not sufficient to satisfy this heavy burden. *United States v. Calandra*, 414 U.S.

338, 345 (1974).  Therefore, "review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct."  *United States v. Torres*, 901 F.2d at 233.

Moreover, speculation that the grand jury was improperly instructed is insufficient to overcome the rule of secrecy in grand jury proceedings that is embodied in Fed. R. Crim. P. 6(e).  *See*, *e.g.*, *United States v. Donald*, 2009 WL 270181, *6 (W.D.N.Y.) (speculation about inadequacy of jury instructions insufficient to invade grand jury secrecy), *report and recommendation adopted*, 2009 WL 960209 (W.D.N.Y. 2009), *aff'd*, 417 F. App'x 41 (2d Cir. 2011); *United States v. Jailall*, 2000 WL 1368055, *2 (S.D.N.Y. 2000) (rule of secrecy, which can only be overcome by a showing by the defendant that grounds exist to dismiss the indictment based upon matters that occurred in the grand jury, applies to legal instructions provided to the grand jury).  Defendants' motions are based solely on speculation. Speculation is no more a basis to overcome the presumption of grand jury secrecy than it is to justify dismissal of the indictment.

Accordingly, this Court recommends that the district court deny defendants' motions to dismiss the indictment or to inspect the grand jury proceedings.

## CONCLUSION

For the reasons stated above, I recommend that the district court deny defendants' motions to suppress evidence and to dismiss the indictment.  (**Docket ## 62, 77**).

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
November 21, 2017

23

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

      **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

      **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[6]

      The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

      **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

      The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

      Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                       *s/Marian W. Payson*
                                     MARIAN W. PAYSON
                              United States Magistrate Judge

Dated: Rochester, New York
       November 21, 2017

---

[6] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).